[No. B159352. Second Dist., Div. Three. Oct. 30, 2003.]

VICKI E. POLLOCK, Plaintiff and Appellant, v.
UNIVERSITY OF SOUTHERN CALIFORNIA et al., Defendants and
Respondents.

Counsel

E. Lyn Lemaire for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Christina L. McEnerney and J. Al Latham, Jr. for Defendants and Respondents.

## Opinion

**ALDRICH, J.—**

### INTRODUCTION

This is the second lawsuit filed by plaintiff Vicki E. Pollock, Ph.D., against her former employer, the University of Southern California. The earlier lawsuit (*Pollock I*) was filed during the termination process. The instant lawsuit (*Pollock II*) was filed after Pollock was finally discharged from employment, but while her appeal in *Pollock I* was pending before this court. In both actions Pollock challenged the method by which she was terminated from her tenured position. In *Pollock I*, we held all of Pollock's contentions were without merit and her sole remedy for alleged defects in the process by which the University revoked her tenure and discharged her from service is by administrative mandamus.

In this appeal, we review the judgment entered after the trial court sustained the demurrer filed by the University and defendant William G. Tierney, Ph.D. (together, defendants are referred to as the University) and denied Pollock leave to amend. The contentions raised in *Pollock II* are nearly identical to those raised in *Pollock I* and again we conclude they are meritless. Moreover, as the same issues were decided in *Pollock I*, much of Pollock's complaint here is barred by the doctrine of res judicata. Accordingly, we affirm the judgment.

We issued an order to show cause why we should not impose sanctions for a frivolous appeal. (Cal. Rules of Court, rule 27(e)(3).) Concluding Pollock's appeal is meritless, we hold her appeal is frivolous (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179]) and impose sanctions.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Predicate facts.*

For review purposes, we assume the truth of the allegations in Pollock's complaint. (*Gulf Ins. Co. v. TIG Ins. Co.* (2001) 86 Cal.App.4th 422, 429

[103 Cal.Rptr.2d 305].) Since 1992, Pollock was a tenured member of the University's Department of Psychiatry and Behavioral Sciences faculty. In 1998, Pollock was assigned to a full-time clinical position as a psychologist with the Department of Psychiatry's Ingleside Hospital. The University also required her to obtain funding to conduct research independently through outside grants. Pollock protested her assignment by agreeing to teach only on Tuesdays and Thursdays. After two years during which Pollock reported to Ingleside Hospital only two out of the five assigned days per week, the University charged her with serious neglect of duty.

The University commenced dismissal proceedings. Pollock unsuccessfully attempted to enjoin the proceedings and then sued the University. The gravamen of the complaint in *Pollock I* was that the University secretly modified the faculty handbook by changing the bases and procedures for dismissal in an effort to facilitate dismissal of tenured faculty, and created a "dismissal machinery" with which it could remove tenured faculty "virtually at will." (*Pollock v. University of Southern California* (November 29, 2001, B145203) [nonpub. opn.].)[1] Pollock further alleged in that action that the University falsified charges against her and forced her out of her research position into clinical work. In our earlier opinion, we affirmed the sustaining of the demurrer to Pollock's complaint on the ground that because the dismissal process had not been completed and no decision about Pollock's continued employment had been made, no cognizable adverse employment action had yet been taken against Pollock.

More relevant to this appeal, we held in *Pollock I* that Pollock's challenges to the procedure by which the University revokes her tenure and discharges her from employment (as distinguished from her claims for retaliation and discrimination) were barred by the rule of *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716 [53 Cal.Rptr.2d 662] (hereinafter, *Pomona College*). In *Pomona College*, a professor sued the college after being denied tenure. Division Two of this District Court of Appeal held in *Pomona College* that "judicial review of tenure decisions," as opposed to discrimination claims, in both public and private universities in California "is limited to evaluating the fairness of the administrative hearing in an administrative mandamus action." (*Id.* at pp. 1722–1724, 1726.) The *Pomona College* court explained that academic peers are uniquely positioned to evaluate a tenure candidate's teaching, research, and contributions to particular field of study. (*Id.* at p. 1726.) The *Pomona College* court recognized, " 'courts must be vigilant

---

[1] While the California Rules of Court prohibit citation to an unpublished opinion (Cal. Rules of Court, rule 977(a)), this case falls within an exception to that rule. Rule 977(b)(1) of the California Rules of Court permits us to rely on *Pollock I* because it is relevant under the doctrine of res judicata.

not to intrude into that determination, and should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure.' " (*Id.* at p. 1725.) As they are not positioned to consider the substantive merits of the tenure decision, absent discrimination, courts are left only with reviewing the fairness of the hearing in an administrative mandamus action. (*Id.* at p. 1726.) The *Pomona College* court held, "California law provides to those who feel wronged by procedural defects in the tenure process—as opposed to those who disagree with substantive evaluations—a remedy. That remedy is administrative mandamus." (*Id.* at p. 1727.)

Applying *Pomona College*, we held in *Pollock I*: "[T]he gravamen of Pollock's . . . complaint is that the University utilized questionable and unauthorized methods and procedures to force her to resign or to revoke her tenure. The complaint repeatedly attacks the 'dismissal machinery' or the process by which a tenured faculty member is dismissed from service with the University. It is therefore manifest that *Pomona College* finally disposes of Pollock's claims other than those for discrimination and retaliation." (*Pollock I, supra,* B145203.)

Also in *Pollock I*, we "reject[ed] Pollock's repeated arguments that the University's dismissal process is replete with procedural and due process deficiencies and that it would be futile to pursue her administrative remedies because they are rife with flaws and are part of the scheme to force her to resign." (*Pollock I, supra,* B145203.) We said that Pollock could not "avoid mandamus review by seeking damages for the procedural unfairness in the University's dismissal process. That is exactly the purpose behind administrative mandamus review—to evaluate the fairness of the administrative hearing. [Citation.] Such purpose 'extend[s] to the questions [of] whether the [defendant] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' [Citation.]" (*Pollock I, supra,* B145203, quoting Code Civ. Proc., § 1094.5, subd. (b).) In *Pollock I*, we held Pollock was required to file a petition for writ of administrative mandamus to pursue her claims.

While the appeal in *Pollock I* was pending, the University completed its dismissal process in August 2000. Pollock had been given a hearing before a faculty panel. The University's hearing panel found adequate cause to dismiss Pollock. Pollock was formally discharged from her position in September 2000.

On June 7, 2001, while the appeal in *Pollock I* was before this court, Pollock commenced *Pollock II*, her second lawsuit seeking damages from the University arising from the revocation of her tenure and her termination from employment.

## 2. *Pollock II.*

Cast as seven causes of action, the complaint against the University seeks damages for (1) perjury; (2) fraud and deceit; (3) wrongful termination in violation of public policy; (4) breach of contract; (5) retaliation in violation of California's Fair Employment and Housing Act (Gov. Code, § 12940 et seq., the FEHA); (6) sex discrimination in violation of the FEHA; and (7) age discrimination in violation of the FEHA.

In her complaint, just as in *Pollock I,* Pollock describes in the first 44 pages how the University created its "dismissal machine" by surreptitiously and without notice to the tenured faculty, altering key terms of the tenure contract defining the bases for dismissal, and falsely asserting the changes were approved by the faculty's representative body, the Academic Senate. Specifically, Pollock alleges, just as she did in her first lawsuit, that the University substituted a semicolon for a comma after the word "misconduct" in the section defining "adequate cause," changed the size and selection method for grievance and dismissal panels, and rigged "sham panel[s]." Continuing, she alleges the University used this "dismissal machine" to implement a scheme to terminate tenured professors, including Pollock, virtually at will.

In her first cause of action entitled "perjury," Pollock alleges the University made false assertions about the punctuation in the faculty handbook's definition of "adequate cause." These false assertions were allegedly made in a declaration signed by Tierney and filed in *Pollock I.* Tierney was the then President of the University Faculty and of the Academic Senate. In his declaration, Tierney stated he had conducted an investigation into Pollock's allegation that the University " 'Administration had fraudulently altered the USC Faculty Handbook' " and concluded that the changes were proposed by the Academic Senate. Attached to his declaration were the e-mail communications Tierney had sent to the faculty reporting this finding. Pollock's complaint alleges that Tierney's declaration is false.

In the second cause of action for damages for fraud, Pollock alleges the University falsely misrepresented to her the faculty's authority to alter the tenure contract and create the dismissal machine. Had she known of the falsity of the representations at any time before termination proceedings were begun, Pollock alleges she would have sought a position at another university.

With respect to the fourth cause of action asserting breach of her employment contract, Pollock alleges that her failure to submit to the assignment at Ingleside Hospital was not adequate cause for dismissal, with the result her dismissal and its procedure breached the implied covenant to adhere to due process and fundamental fairness.

The University demurred to Pollock's first, second, and fourth causes of action, i.e., all claims except the statutory discrimination and public policy claims. The University also moved to strike *some* of the asserted public policy bases of the third cause of action for wrongful termination against public policy, and moved for sanctions against Pollock and her counsel for failing to seek review by administrative mandamus.

The trial court sustained the University's demurrer without leave to amend and granted, in part, the University's motion to strike. At Pollock's suggestion, the trial court dismissed the public policy cause of action *without prejudice,* but dismissed with prejudice the discrimination claims. Pollock's timely appeal followed entry of judgment dismissing the entire action.

## CONTENTION

Pollock contends the trial court abused its discretion in sustaining the demurrer without leave to amend.[2]

## DISCUSSION

### 1. *Standard of review.*

" ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citations.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]' [Citation.]" (*Carden v. Getzoff* (1987) 190 Cal.App.3d 907, 912 [235 Cal.Rptr. 698], quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

### 2. *Pollock cannot state claims for fraud or breach of contract.*

Pollock's fraud and breach of contract claims are nothing more than a duplication of her first lawsuit. As before, the gravamen of Pollock's complaint is an attack on the legitimacy of the dismissal process. She claims the

---

[2] Pollock does not challenge the dismissal of the statutory discrimination claims (the fifth through seventh causes of action).

University used clandestine and fraudulent methods to modify the grounds for discipline and the procedures for review so as to revoke her tenure and then to discharge her from her position at the University.

### a. *Existing case law resolves the second and fourth causes of action.*

*Pomona College* remains dispositive. Pursuant to *Pomona College*, an administrative mandamus action (Code Civ. Proc., § 1094.5) provides the exclusive remedy to a professor in a private university for any procedural defects which he or she believes existed in the tenure review or in the grievance process. (*Pomona College, supra*, 45 Cal.App.4th at p. 1729.) Any challenge Pollock seeks to make to the process and procedure by which the University (1) used "dismissal machinery," (2) revoked her tenure, (3) dismissed her from service, or (4) determined that Pollock's refusal to work at Ingleside Hospital constituted "serious neglect of duty," or "misconduct" by academic norms, should have been raised by way of an administrative mandamus action. That is, apart from the discrimination and "perjury" claims, Pollock may only raise her procedure-based claims by way of a petition for writ of administrative mandamus. Given that she failed to file such a writ petition, no amount of amendment to the complaint can render these claims viable. Thus, the trial court did not err in sustaining the demurrer and denying leave to amend.

Pollock argues we should disregard *Pomona College, supra*, 45 Cal.App.4th 1716, as unsound. We decline to disregard *Pomona College* because it is well reasoned. Also, we already rejected Pollock's same request in *Pollock I*, and instead based our decision on *Pomona College*. Furthermore, subsequent to our opinion in *Pollock I*, *Pomona College* was relied on by Division Two of this District Court of Appeal in *Gutkin v. University of Southern California* (2002) 101 Cal.App.4th 967 [125 Cal.Rptr.2d 115], which mirrors Pollock's case. Gutkin, a faculty member who, like Pollock, lost his tenure and was discharged from employment, also sued the University challenging the " 'Dismissal Machinery.' " (*Id.* at p. 978.) The *Gutkin* court reached the same result based on *Pomona College* as we did in *Pollock I* and have here, namely, that the University's demurrer was properly sustained without leave to amend "because Gutkin failed to challenge the University's tenure and grievance procedure by way of administrative mandamus." (*Gutkin*, at p. 970.) *Gutkin* parallels this case and, along with *Pomona College*, disposes of Pollock's second and fourth causes of action.

Pollock contends reliance on *Pomona College* deprives her of the right to a jury trial. *Pomona College* set forth a very cogent rationale for limiting the scope of judicial review of tenure-related decisions: Academic peers are the only individuals capable of evaluating a scholar's credentials and contributions. This is because peers are alone equipped to assess aspects of arcane

scholarship, to make subjective determinations about teaching ability, research scholarship, and professional stature, and to judge whether a colleague's work reflects favorably on the institution. (*Pomona College, supra,* 45 Cal.App.4th at p. 1726.) Universities should be free to establish priorities and set levels of academic achievement. (*Ibid.*) Lay jurors are simply not qualified to make the necessary assessments. As the *Pomona College* court explained, courts and juries should not intrude on the tenure decision and should not substitute their judgment for that of academics about the qualifications of faculty members for promotion and tenure. (*Id.* at pp. 1725–1726.)

Pollock's same argument—that the *Pomona College* rule thwarts the right to jury trial—was also rejected in *Gutkin v. University of Southern California, supra,* 101 Cal.App.4th at page 978: "In his attempt to distinguish *Pomona College,* Gutkin appears to contend that once the initial decision to grant or deny tenure has been made, the judgment of the professor's academic peers falls by the wayside, and *a lay jury may then step in* to determine whether he or she remains entitled to 'full membership in the academic community.' But such a determination still requires an assessment of whether the professor's conduct is consistent with or contrary to academic norms, which only academic peers, not lay jurors, are qualified to determine." *Gutkin* is persuasive. Pollock's argument that an administrative proceeding will deny a professor a trial by jury has been twice rejected by published opinions.

Pollock also argues, with respect to her fraud claim, that it "is actionable under *Lazar* [*v. Superior Court* (1996) 12 Cal.4th 631 [49 Cal.Rptr.2d 377, 909 P.2d 981]]." She argues the University's "deceit <u>induced</u> Prof. Pollock Into [*sic*] remaining at the University when, had she known about the University's intentions, she would have made a lateral move to a tenured slot at another university." (Underlining in original.)

This same argument was also discarded by the *Gutkin* court when it stated, "*Lazar* involved fraudulent inducement to *enter into* an employment contract (the employer fraudulently induced the plaintiff to move from the East Coast to California)—not a fraudulent inducement '*to remain* at [the University]' as Gutkin would have it. *Lazar* thus has no application to the facts of this case. As the Supreme Court stated in *Hunter v. Up-Right, Inc.* (1993) 6 Cal.4th 1174, 1184–1185 [26 Cal.Rptr.2d 8, 864 P.2d 88]: '[I]t is difficult to conceive of a wrongful termination case in which a misrepresentation made by the employer to effect termination could ever rise to the level of a separately actionable fraud. In essence, such misrepresentations are merely the means to the end desired by the employer, i.e., termination of employment. They cannot serve as a predicate for tort damages otherwise unavailable under *Foley* [*v. Interactive Data Corp.* (1988) 47 Cal.3d 654 [254

Cal.Rptr. 211, 765 P.2d 373]].' " (*Gutkin v. University of Southern California, supra,* 101 Cal.App.4th at p. 980, italics added.)[3]

We followed *Pomona College* in *Pollock I* and find *Gutkin's* reiteration of *Pomona College* to be persuasive. Thus, other than her discrimination, "perjury," and public-policy based claims, *Pomona College* and *Gutkin* finally dispose of Pollock's challenges to the manner and method by which the University took disciplinary action against her.

> b. *The doctrine of res judicata bars the second and fourth causes of action.*

Quite apart from the *Pomona College* and *Gutkin* decisions, the doctrine of res judicata precludes Pollock from relitigating the second and fourth causes of action. *Pollock I* is a final decision on the merits that administrative mandamus is Pollock's exclusive remedy for her claim of procedural defects in the proceeding to revoke her tenure and dismiss her from service.

■ "The doctrine of res judicata rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent." (*Citizens for Open Access Etc. Tide, Inc. v. Seadrift Assn.* (1998) 60 Cal.App.4th 1053, 1065 [71 Cal.Rptr.2d 77].) The doctrine of res judicata—or claim preclusion—adheres when (1) the issues decided in the prior adjudication are identical with those presented in the later action; (2) there was a final judgment on the merits in the prior action; and (3) the party against whom the plea is raised was a party or was in privity with a party to the prior adjudication. (*Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1015 [48 Cal.Rptr.2d 174].)

The issues in Pollock's two complaints are the same, regardless of the theory and title Pollock attaches to the various causes of actions. The primary right Pollock seeks to vindicate (*Branson v. Sun-Diamond Growers* (1994) 24 Cal.App.4th 327, 340–341 [29 Cal.Rptr.2d 314]) in both *Pollock I* and in *Pollock II* is the injury to her right to fairness in the procedures used to revoke her tenure and discharge her from employment. In fact, much of her complaint here is simply a duplicate of the complaint in *Pollock I.*

■ Our opinion in *Pollock I* is a final judgment on the merits, as the Supreme Court has denied review. The fact that the appeal in *Pollock I*

---

[3] Pollock additionally argues that her refusal to work at Ingleside Hospital and her lack of research do not constitute adequate cause. This argument is likewise subject to judicial review only by administrative mandamus because such conduct raises the question of compliance with academic norms. (*Gutkin v. University of Southern California, supra,* 101 Cal.App.4th at p. 978.)

resulted from the sustaining of a general demurrer does not preclude application of the res judicata doctrine. (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 383–384 [62 Cal.Rptr.2d 803].) "[A] judgment on a general demurrer will have the effect of a bar in a new action in which the complaint states the same facts which were held not to constitute a cause of action on the former demurrer or, notwithstanding differences in the facts alleged, when the ground on which the demurrer in the former action was sustained is equally applicable to the second one. [Citations.]" (*McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 787, 794 [168 Cal.Rptr. 89].) The complaints in both actions allege the same facts concerning the creation of a dismissal procedure designed to thwart tenure, and seek vindication of the same primary right to fairness in the tenure and grievance process. Also, the grounds upon which the demurrers in both *Pollock I* and *Pollock II* were sustained are the identical, purely legal analysis under *Pomona College*. The only difference between *Pollock I* and *Pollock II* is that the University has now completed the dismissal procedure. Still, Pollock's second action seeks *damages* for the perceived unfairness of the procedure by which the University brought and disposed of the charges against her. Therefore, these claims were fully and finally adjudicated in *Pollock I* and are thus barred. (*Ibid.*) The second and fourth causes of action are finally disposed of by our opinion in *Pollock I*.[4]

### 3. *Pollock's appeal from the dismissal of her third cause of action is not reviewable.*

The trial court granted in part the University's motion to strike certain of the public policy grounds Pollock alleged in her third cause of action for wrongful termination in violation of public policy. Thereafter, Pollock voluntarily *dismissed that cause of action.* Pollock challenges the ruling on the motion to strike certain of the policies listed in the third cause of action.

However, the validity of the court's order striking allegations is not reviewable. (*Yancey v. Fink* (1991) 226 Cal.App.3d 1334, 1343 [277 Cal.Rptr. 415] [" 'A wilful dismissal terminates the action for all time and affords the appellate court no jurisdiction to review rulings on . . . motions made prior to the dismissal' "].) Indeed, Gutkin tried this maneuver to the same effect. There, the appellate court stated, "Because Gutkin dismissed his remaining claims in this case *without prejudice*, the voluntary dismissal could not have the legal effect of a final judgment, and could not serve to expedite an appeal.

---

[4] The final element of res judicata is also satisfied. The same parties were present in *Pollock I* as in this case: Dr. Pollock and the University. The only difference is the substitution in the second lawsuit of Tierney, President of the University Faculty and of the Academic Senate, in place of George Simpson, M.D., who was sued in the first lawsuit in his capacity as interim Chair of the Department of Psychiatry. Pollock is barred from bringing this action.

By voluntarily dismissing the action *without prejudice* Gutkin lost his ability to challenge the trial court's interim orders. Accordingly, no appeal lies" from earlier discovery orders. (*Gutkin v. University of Southern California, supra,* 101 Cal.App.4th at p. 975 (*Gutkin*).) Similarly, no appeal lies here from the grant of the University's motion to strike some of the public policies listed in the third cause of action.

### 4. *Pollock cannot allege a cause of action for "perjury," abuse of process, or malicious prosecution of civil proceedings.*

Pollock's first cause of action for damages for "perjury" is based on Tierney's declaration, filed in *Pollock I,* in which he explained his conclusion that the changes in punctuation made to the definition of "adequate cause" in the faculty handbook were not surreptitious or fraudulent, but approved by the Academic Senate. In her complaint at issue here, Pollock alleges Tierney's declaration is perjurious. This is the only part of this appeal that has not otherwise been disposed of by *Pollock I, Pomona College,* or *Gutkin.* The contention is nonetheless unavailing.

■ There is no civil cause of action for "perjury." (*Taylor v. Bidwell* (1884) 65 Cal. 489, 490 [4 P. 491]; *Kappel v. Bartlett* (1988) 200 Cal.App.3d 1457, 1463 [246 Cal.Rptr. 815]; see *Temple Community Hospital v. Superior Court* (1999) 20 Cal.4th 464, 472 [84 Cal.Rptr.2d 852, 976 P.2d 223].) Perjury is a criminal wrong.

On appeal, as she did below, Pollock argues that her perjury claim is really a cause of action for malicious prosecution or for abuse of process and she seeks leave to amend to allege one of these theories.

■ The tort of malicious prosecution of a civil proceeding requires (1) the institution of a civil action by the malicious-prosecution defendant and (2) the action's favorable termination for the malicious-prosecution plaintiff. (*Adams v. Superior Court* (1992) 2 Cal.App.4th 521, 528 [3 Cal.Rptr.2d 49]; *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 50 [118 Cal.Rptr. 184, 529 P.2d 608].) ■ The facts alleged by Pollock cannot support a claim for malicious prosecution of a civil proceeding because (1) neither the University nor Tierney instituted the earlier proceeding, *Pollock I,* Pollock did; and (2) the earlier proceeding was not terminated in Pollock's favor. Although the University filed Tierney's declaration in connection with its motion for sanctions during *Pollock I,* a malicious prosecution claim cannot be based on subsidiary procedural actions taken within the litigation (*Adams v. Superior Court, supra,* at p. 528), such as a motion for sanctions. Therefore, Pollock cannot amend her complaint to allege this cause of action.

■ The tort of abuse of process is barred by the litigation privilege, which protects a "publication or broadcast . . . . [¶] . . . [¶] (b) In *any* . . . (2) judicial

proceeding . . . ." (Civ. Code, § 47, subd. (b)(2), italics added.) Section 47, subdivision (b)(2) is a defense to an abuse of process action. (*Abraham v. Lancaster Community Hospital* (1990) 217 Cal.App.3d 796, 824 [266 Cal.Rptr. 360]; *Carden v. Getzoff, supra,* 190 Cal.App.3d at p. 913.) "The privilege is broadly applied to protect most publications within lawsuits provided there is some connection between the lawsuit and the publication. [Citation.]" (*Adams v. Superior Court, supra,* 2 Cal.App.4th at p. 529; *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365].) Doubts about the privilege's applicability are resolved in favor of its use. (*Ibid.*)

This court held the Civil Code section 47, subdivision (b)(2) privilege applied to bar a claim for abuse of process for the filing of an allegedly false document valuing a husband's medical practice in a dissolution action. In *Carden v. Getzoff, supra,* 190 Cal.App.3d at page 913, we stated, "While courts have argued about the scope of the privilege [citation], it is clear that 'the privilege has been applied to publications which were private communications between parties and which communications were related not only to actual but potential court actions.' [Citation.]" Thus, we held that publications made in preparing documents for submission to the court in a dissolution proceeding, as well as the defendant's testimony at the trial, were covered by the absolute privilege of former section 47, subdivision (b)(2), because they were part of a judicial proceeding, where the dissolution action was pending, and the defendant had been hired as an expert witness for the appellant's wife. "This situation is clearly part of a judicial proceeding . . . ." (*Carden,* at p. 913.)

The purpose and use of Tierney's declaration and supporting documentation parallels the circumstances in *Carden.* Regardless of whether Tierney's declaration is perjurious, it is a privileged publication because it was a private *communication* between members of a party (Tierney's e-mail communications to members of the University's Academic Senate) that related not only to potential but to actual litigation. The e-mail was generated in response to *Pollock I* and the declaration and attached exhibits were communications relating to a judicial proceeding—*Pollock I.* (*Carden v. Getzoff, supra,* 190 Cal.App.3d at p. 913.) Pollock argues that " '[b]ecause the tort is based on the wrongful *conduct* of filing and executing a deliberately false declaration, the litigation privilege . . . does not apply.' " (Italics and underscoring in original.) By this argument, Pollock seeks to fit the facts of this case within the sole limitation on the reach of the privilege, namely, that it does not apply to *conduct.* (*Drum v. Bleau, Fox & Associates* (2003) 107 Cal.App.4th 1009, 1024 [132 Cal.Rptr.2d 602] ["the event claimed to be protected must be *communication* not *conduct*"].) The effort fails. The only event alleged to be wrongful here is the same as that alleged in *Carden,* namely, the allegedly false declaration. (*Carden,* at p. 913.) The privilege protects communication. (Civ. Code, § 47; *Drum v. Bleau, Fox & Associates, supra,* at p. 1027.) The

declaration functions as written testimony and thus constitutes communication, not conduct. This is exactly the sort of communication the privilege is designed to protect.

Pollock's reliance on *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157 [232 Cal.Rptr. 567, 728 P.2d 1202] is misplaced. That case raised, but did not decide, whether it was appropriate to extend the Civil Code section 47, subdivision (b)(2) privilege to the tort of abuse of process. (*Oren Royal Oaks*, at p. 1167.) That case is not authority for an issue not decided.

Pollock cites *Kappel v. Bartlett, supra,* 200 Cal.App.3d 1457, for the proposition that a knowingly false declaration states a claim of abuse of process. The plaintiff in *Kappel* alleged a process server filed a declaration certifying he had served process on a defendant. Process was never served on the defendant, who then suffered a default judgment against him. The plaintiff sued the process server, among others. (*Id.* at p. 1460.) The *Kappel* court held an abuse of process claim had been stated. (*Id.* at p. 1467.) Yet, the only comment *Kappel* makes concerning the privilege is in a footnote where, citing *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc., supra,* 42 Cal.3d 1157, the court observed that the applicability of the privilege to abuse of process claims was unresolved. (*Kappel v. Bartlett, supra,* at p. 1469, fn. 2.) We conclude the trial court properly denied leave to amend because the "perjury" cause of action cannot be amended to state a claim.[5]

### 5. *Portions of this appeal are frivolous.*

The University requests that we impose sanctions against Pollock and her counsel, E. Lyn Lemaire, for prosecuting a frivolous appeal. (*In re Marriage of Flaherty, supra,* 31 Cal.3d 637.) We issued an order to show cause directing Pollock and her counsel to file responses. (Cal. Rules of Court, rule 27(e)(3).) We have reviewed the briefs and heard oral argument and conclude sanctions are required.

Code of Civil Procedure section 907 provides, "When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may

---

[5] Finally, Pollock contends the trial court erred in awarding sanctions against her and her counsel in the amount of $1,000 for filing frivolous perjury and fraud claims. (Code Civ. Proc., § 128.7, subd. (d).) She argues that "the factual allegations of perjury support, at a minimum, causes of action under alternative tort theories" of abuse of process and malicious prosecution. Given our conclusions above, the contention is unavailing. Additionally, with respect to the fraud claim, because it was a nearly verbatim replica of the allegations rejected in *Pollock I* and in *Gutkin, supra,* 101 Cal.App.4th 967, there was no error in ordering sanctions.

add to the costs on appeal such damages as may be just." (See also Cal. Rules of Court, rule 27(e).) Our Supreme Court in *In re Marriage of Flaherty, supra,* 31 Cal.3d 637, set forth the applicable standard: "an appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit. [Citation.]" (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650.)

With the exception of her contentions concerning the first cause of action, Pollock's appeal lacks all merit. (*Maple Properties v. Harris* (1984) 158 Cal.App.3d 997, 1010 [205 Cal.Rptr. 532] [imposing sanctions for partially frivolous appeal if frivolous claims are "significant" and "material" part of appeal].) The gravamen of the second and fourth causes of action in *Pollock II* is virtually identical to, and in part a verbatim duplicate of, *Pollock I.* Our opinion in *Pollock I* became final months *before* Pollock filed her notice of appeal in this case. Hence, even if Pollock might have arguably had a basis for filing her complaint in *Pollock II,* by the time she filed her notice of appeal, she knew *Pomona College, supra,* 45 Cal.App.4th 1716, and *Pollock I* disposed of her action seeking damages for the method and manner by which the University revoked her tenure and discharged her. Also, before Pollock filed her opening brief in this appeal, *Gutkin, supra,* 101 Cal.App.4th 967, was published. *Gutkin* reaches the same result as *Pollock I,* and rejects many of the same arguments raised and rejected in *Pollock I.* Given this precedent, all Pollock had to do to challenge the University's dismissal procedures was to file a petition for writ of mandamus. Instead, she persists in pursuing an appeal that she knows has no merit. The fact both *Gutkin* and *Pollock* were represented by the same attorney makes the repetition of these same assertions all the more frivolous.

Nor are we persuaded by Pollock's argument this case is not frivolous because it represents an attempt to change existing law under *Pomona College* and *Gutkin.* (See *McDonald v. John P. Scripps Newspaper* (1989) 210 Cal.App.3d 100, 106–107 [257 Cal.Rptr. 473].) The only reference to *Pomona College* Pollock made in her entire opening brief here is in reference to her challenge to the ruling striking allegations in the *third cause of action.* More important, we already declined her invitation to disagree with *Pomona College* in *Pollock I.* This portion of the appeal is not close (*Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 34 [96 Cal.Rptr.2d 553]), and "any reasonable attorney would agree that [it] is totally and completely without merit. [Citation.]" (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650.)

That part of Pollock's appeal from the dismissal of her third cause of action is likewise frivolous. Pollock argues in her opposition to the sanctions motion that the issue of what policies underlie a claim for wrongful termination in violation of public policy "is <u>squarely</u> before the Court of Appeal for

the first time." (Underlining in original.) The issue is not squarely before this court because Pollock voluntarily dismissed that cause of action without prejudice. Moreover, Pollock's counsel knows the consequence of this strategic maneuver because she represented Gutkin when the *Gutkin* court held in such a situation that *no appeal lay* from interim orders. (*Gutkin v. University of Southern California, supra,* 101 Cal.App.4th at p. 975.) Other than the contentions concerning the first cause of action, this appeal is patently frivolous.

As for the amount of sanctions, we consider the facts in relation to the policy underlying Code of Civil Procedure section 907. (*National Secretarial Service, Inc. v. Froehlich* (1989) 210 Cal.App.3d 510, 526 [258 Cal.Rptr. 506].) We have additionally considered the University's declaration, the fact this appeal is largely a duplicate of *Pollock I,* and the fact the University already obtained sanctions from Pollock below. Based on all of these factors, the reasonable amount of expenses incurred by the University for defending Pollock's improper appeal is $14,000, to be paid jointly and severally by Pollock and her attorney E. Lyn Lemaire.

In addition to sanctions payable to the University, a separate sanction should be payable by Pollock's counsel, E. Lynn Lemaire, directly to the clerk of the court. " 'Other appellate parties, many of whom wait years for a resolution of bona fide disputes, are prejudiced by the useless diversion of this court's attention. [Citation.] In the same vein, the appellate system and the taxpayers of this state are damaged by what amounts to a waste of this court's time and resources. [Citations.] Accordingly, an appropriate measure of sanctions should . . . compensate the government for its expense in processing, reviewing and deciding a frivolous appeal. [Citations.]' [Citation.]" (*In re Marriage of Schnabel* (1994) 30 Cal.App.4th 747, 755 [36 Cal.Rptr.2d 682].)

As explained in *In re Marriage of Schnabel, supra,* 30 Cal.App.4th at page 756, "sanctions may be assessed solely against a lawyer who, because the appeal was so totally lacking in merit, had a professional obligation not to pursue it and perhaps should have declined the case outright. [Citations.]" Here, the very same attorney who represented Pollock during *Pollock I* was the attorney for plaintiff in *Pollock II,* as well as in *Gutkin.* Counsel's participation in each of these cases made her intimately aware of the views of this court and of the *Gutkin* court. We must read the definition of frivolous appeal to avoid a chilling effect on the assertion of litigants' rights on appeal. "Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal." (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650.) However, by the time the appellate brief in *Pollock II* was filed, counsel knew many of her arguments

concerning the second and fourth causes of action were unmeritorious. One goal of sanctions is to deter future frivolous litigation. (*Collisson & Kaplan v. Hartunian* (1994) 21 Cal.App.4th 1611, 1621 [26 Cal.Rptr.2d 786].) Despite the number of times the rule of *Pomona College* has been endorsed and reiterated to this counsel, she persists in pursuing the same arguments. Likewise, the appeal from dismissal of the third cause of action is frivolous because this attorney was warned of the consequences of a voluntary dismissal in *Gutkin*. Therefore, we conclude Pollock's attorney should pay sanctions to the clerk of the appellate court.

To determine the amount of sanctions to be paid by counsel to the clerk of the Court of Appeal, one court established the cost to the state of processing an average civil appeal in 2000 to be $5,908.26. (*Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 36.) Because the appeal from the dismissal of the first cause of action was not frivolous, we assess a sanction in the amount of $3,000 to be paid only by E. Lyn Lemaire to the appellate court clerk within 15 days after issuance of the remittitur, to compensate the court for the expense of processing, reviewing, and deciding what has already been decided by this court.

This opinion constitutes a written statement of our reasons for imposing sanctions. (*In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 654; *Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1083 [81 Cal.Rptr.2d 46].)[6]

### DISPOSITION

The judgment is affirmed. Respondent shall recover costs on appeal. In addition, Pollock and E. Lyn Lemaire are directed to pay respondent $14,000 jointly and severally as sanctions, and E. Lyn Lemaire is directed to pay the clerk of the court the additional sum of $3,000, individually as sanctions for prosecuting a frivolous appeal.

Croskey, Acting P. J., and Kitching, J., concurred.

A petition for a rehearing was denied December 1, 2003, and appellant's petition for review by the Supreme Court was denied February 24, 2004.

---

[6] Those portions of Pollock's opening brief that refer to other professors who are also represented by E. Lyn Lemaire are stricken. We have denied Pollock's request for judicial notice filed on December 3, 2002.